UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JOHN STEVEN WALKER,                    )
                                       )
            Plaintiff,                 )
                                       )
     v.                                )    Case No. 3:05-0153
                                       )    Judge Echols
FAIRFIELD RESORTS, INC.,               )
a/k/a FAIRFIELD RESORT                 )
COMMUNITIES, INC., and                 )
FAIRFIELD COMMUNITIES, INC.,           )
                                       )
            Defendants.                )

## MEMORANDUM

Pending before the Court is the "Motion for Summary Judgment" (Docket Entry No. 24) filed by the Defendants Fairfield Resorts, Inc. a/k/a Fairfield Resort Communities, Inc., and Fairfield Communities, Inc. ("Fairfield" or Defendants). Plaintiff John Steven Walker ("Walker" or Plaintiff) filed a response in opposition to the motion (Docket Entry No. 27), to which Defendants have replied (Docket Entry No. 27). Also before the Court is Defendants' "Motion to Strike" (Docket Entry No. 30), to which Plaintiff has responded in opposition (Docket Entry No. 33). Finally, Plaintiff has filed a "Motion" seeking a *nunc pro tunc* Order (Docket Entry No. 34) which would deem his response to the Motion for Summary Judgment as having been filed three days earlier.

1

## I. **FACTUAL BACKGROUND**

In this action, Plaintiff claims he was discriminated against on account of his race in violation of Title VII, 42 U.S.C. § 2000e *et seq.,* and the Tennessee Human Rights Act, T.C.A. § 4-21-101 *et seq.* Plaintiff claims he was removed from a sales manager position and later was not promoted back into a virtually identical position because of his race. He also alleges "overall disparate treatment" because of his race. As a result of Defendants' alleged activity, Plaintiff claims he was constructively discharged from employment with the Defendants in retaliation for having filed an EEOC charge. Construed in Plaintiff's favor, the facts underlying his allegations are as follows.

Plaintiff applied to work at the Fairfield Glade Resort in Crossville, Tennessee on February 28, 2000. He was hired as a front-line sales representative which meant that he tried to sell time share interests in a Fairfield property to guests who visited the resort during a tour. (Pf. Depo. at 41, 46).

During his second year of employment, Plaintiff agreed to become an in-house sales representative. (Def. SOF 4). In the in-house sales position, Plaintiff's clientele consisted of resort guests who already owned time share interests with Fairfield or with another company. Plaintiff's job was to try to upgrade the guests' ownership through additional purchases. (Def. SOF. 5).

In January 2003, Plaintiff voluntarily transferred to

2

Fairfield's Nashville location, where he became an RCI[1] sales representative. As an RCI sales representative, Plaintiff was responsible for persuading time share owners with interests in other companies to exchange those interests for Fairfield "points" or time share interests. He also was responsible for convincing Fairfield owners who utilized the RCI exchange system to upgrade their ownership. (Def. SOF ¶¶ 8-10).

Initially, Plaintiff was paid a base pay and a small commission. Later, his compensation was based entirely on commission. (Def. SOF ¶ 11). Under a formula applicable to all front-line sales representatives, Plaintiff's commission ranged from 6% to 15% of the sales price, depending upon the volume of his sales activity. (Def. SOF ¶ 12). RCI sales representatives likewise were compensated in accordance with a commission plan, except that the commissions were three percentage points higher than those available to sales representatives on other teams. (Def. SOF ¶ 14).

Fairfield sales representatives are expected to achieve a certain minimum number of sales based upon the number of tours [2]

---

[1] RCI is an acronym for Resorts Condominium International. (Walker Depo. at 63).

[2] Plaintiff claims that towards the end of his tenure, Defendant incorrectly calculated the number of tours he had given. He admitted, however, that there was a procedure whereby the tour reports could be corrected, and that problems with the tour reports pertained not only to him, but to all of the sales people. (Pf. Depo. at 196-199).

3

given within a particular period, or face corrective action, up to and including termination. (Def. SOF ¶ 16). Sales were calculated using an Average Per Guest ("APG") sales formula.

The APG sales formula divides the dollar volume of sales by the number of guests seen, or taken on a tour, by a sales representative. (Def. SOF ¶¶ 16-17).[3] There is also a rescission adjusted APG which adjusts sales downward for the expected number of contract rescissions for a given period based upon historical data. (Def. SOF ¶ 34).

Each year, the corporate sales office in Florida calculates a budgeted sales efficiency rate (budgeted APG), for each sales site in the country, including the Nashville site. These budgets are based in part upon a site's prior sales record and are provided to each site's Vice President who must ensure that his or her site maintains or exceeds the established, minimum APG for the year. (Def. SOF ¶ 33).

When Plaintiff joined the RCI sales team at the Fairfield Nashville site, he participated in regular meetings with the members of his team (including the team's manager Mickey Ruggerio ("Ruggerio")) to review the APG results. (Def. SOF ¶¶ 19, 22). Ruggerio told team members, including Plaintiff, that the minimum APG was 1200. (Def. SOF ¶ 22).

---

[3]By way of example, if a sales representative took ten people on tours and sold one $12,000 contract, then the average would be $1200 per person. (Def. SOF ¶ 17).

In late July or early August 2003, Ruggerio left Fairfield Nashville. (Def. SOF ¶ 23). Following Ruggerio's departure, a job vacancy notice was posted for his position. (Def. SOF ¶ 24). Plaintiff applied for the position of manager of the RCI sales team. (Def. SOF ¶ 25). Fran Santore ("Santore"), a Caucasian male who also had been a member of Ruggiero's team, applied for the position, as did Bob Ruff ("Ruff"), a Caucasian male, who was an in-house sales representative. (Def. SOF ¶¶ 26-27).

Three individuals, Tim Hurley ("Hurley"), the in-house director, Sharon Barnes ("Barnes"), the Human Resource director, and Bobby Copeland ("Copeland"), the new sales representative trainer, interviewed the candidates. (Def. SOF ¶ 28). They recommended Plaintiff for the position and Dave Labelle ("Labelle"), the Nashville operations Vice President, chose Plaintiff for the position. (Def. SOF ¶ 29).

Plaintiff accepted the position and assumed the role of manager of the RCI sales team effective September 17, 2003. (Def. SOF ¶ 31). Santore remained on the team, as did two other RCI sales representatives, Shannon Mathews and Brian Kemp. (Def. SOF ¶ 32).

When Plaintiff took over management of the RCI team, he was the only African American manager at Fairfield Nashville. (Pf. Depo. at 114-116). Plaintiff claims that within two days of taking on the role of RCI sales manager, Labelle told him that

5

Plaintiff's tenure might be the shortest in history given his APG figures. (Pf. Depo. at 117). He also claims that at some point early in his management tenure, Fairfield Nashville held an awards banquet but he, unlike any other manager, was not given the opportunity to pass out the awards to the members of his team. (Pf. Depo. at 121-123). According to Plaintiff, Barnes stated that this was a mere "oversight." (Pf. Depo. at 125). Plaintiff further claims that at one point, a sales representative was allowed to hand out the paychecks to his team.

At the time Walker assumed management of the RCI sales team, the team's APG was approximately 1400. The team's budgeted APG at the time was 1194. (Def. SOF Dep. ¶ 35). However, upon taking over the team, Plaintiff unilaterally set the expected APG goal for his team members at 1000, meaning that, absent an exceptional performer, the team would fall below the budgeted APG. (Def. SOF ¶ 36). In other words, if the average for each team member was Walker's expected 1000, the budgeted APG would not be met.

As sales manager, Plaintiff monitored the RCI team's performance daily. He also had access to reports that reflected the performance of his team on a daily, weekly, and monthly basis. (Def. SOF ¶ 37). If an individual was not performing up to par, Plaintiff had the ability to institute corrective action. (Def. SOF ¶ 38). In fact, on at least one occasion, Plaintiff told one of his team members that if he did not make two sales within the

6

next ten tours, he would be cut from the team. (Def. SOF ¶ 39).[4]

During October 2003, Plaintiff's first full month as team manager, RCI had an APG of 952, even though the budgeted APG was 1240. (Def. SOF ¶ 42). The next month, the RCI team had an APG of 832, while the budgeted APG for this period was 1230. The decline continued in December 2003, with Plaintiff's team garnering an APG of 790. The budgeted APG for that month was 1110. (Def. SOF ¶¶ 41-43).

In January 2004, the RCI sales team achieved an APG of 1083 and the budgeted APG was 1418. (Def. SOF ¶ 45). In February 2004, Plaintiff's team saw a precipitous decline in its APG. The RCI team's APG for the month was only 202. The budgeted APG was 1267. (Def. SOF ¶ 46).

Because of its abysmal figures, the RCI team was disbanded effective March 1, 2004. Plaintiff first heard about the decision from another employee when he was attending a Fairfield training event at another location. (Pf. Depo. at 150).

In mid-February 2003, Plaintiff participated in a meeting with Hurley, who explained that a decision had been made to move RCI into a different sales direction. There was no suggestion that the decision had been based upon race, nor had Hurley ever made any

---

[4]As it turned out, the team member managed only one sale. To keep from cutting him from the team, Plaintiff gave him credit for one of Plaintiff's sales. This was in contravention of company policy, but Defendants did not become aware of this fact until Plaintiff's deposition. (Labelle Decl. Ex. 19).

7

disparaging racial remarks.    At that time, Plaintiff did not suggest that he thought the decision to disband the RCI team was in any way based upon Plaintiff's race.    (Def. SOF ¶ 48).

Upon the dismantling of the team, all of its members became in-house sales representatives under the management of Lee Acker ("Acker"), an in-house sales manager. (Def. SOF ¶ 49).    Defendants assert that because the type of guests normally toured by the RCI team are better served by specially-trained and experienced salespersons, and because there is a good deal of revenue to be generated by RCI sales, it was determined that a new approach would be developed for the RCI team. (Labelle Decl. ¶ 14).    Accordingly, on March 24, 2004, an announcement was posted at Fairfield Nashville for the position of RCI Selling Sales Manager.    The new RCI manager would manage a sales team, with the objective of assisting the Vice President of Sales to exceed the RCI budget by at least 20%.    The new manager was also expected to take guests on tours and to make personal sales above the minimum APG level. (Def. SOF ¶ 51).

Both Plaintiff and Santore submitted applications and were interviewed for the RCI Selling Sales Manager position.    (Def. SOF ¶ 52).    In an EEOC charge, Hurley claims he was asked by Labelle to create a false performance memorandum about Plaintiff so as to thwart Plaintiff's chances of getting the promotion.    (Docket Entry No. 1, Ex. C).

8

During Plaintiff's interview, his prior performance as RCI Sales Manager was discussed with Labelle, including Plaintiff's monthly APG figures. Labelle explained that one of the reasons the RCI team was dismantled was the team's performance under Plaintiff's management. At no time during the interview was any comment made about Plaintiff's or Santore's race. (Def. SOF ¶ 53).

On a Sales Leader Selection Process Form, Labelle indicated that Plaintiff "would make a good front-line manager" because he had "strong coaching skills." Labelle never indicated that Walker would not be considered for other management positions at the Nashville location. (Def. SOF ¶ 54).

Santore, who had surpassed Plaintiff's APG by a considerable margin and had been a top performer with over a million in sales the previous year, was chosen for the RCI management position. (Def. SOF ¶ 55). Plaintiff joined the new RCI sales team under Santore and remained on the team through July 2004. Plaintiff does not believe that Santore treated him differently on the basis of his race. (Def. SOF ¶ 56).

The new RCI team led by Santore was eventually disbanded in July 2004 because while its performance improved from Mr. Walker's tenure, it still did not meet budgeted sales expectations. To date, there has been no further attempt to reinstate a separate RCI sales team at Fairfield Nashville. (Def. SOF ¶ 58).

Before the RCI sales team was disbanded, Plaintiff requested

9

and was allowed to transfer to a position as an exit sales representative. (Def. SOF ¶ 59). Plaintiff does not complain about the way he was treated as a member of that team or about his commission structure, which was the same as other sales representatives. (Def. SOF ¶ 59).

While Plaintiff was an exit sales representative, Labelle approached him about being a front-line sales manager because Plaintiff liked to train people. The position was open because a prior front-line manager had left to take a job in another state. (Def. SOF ¶ 60). In October 2004, Walker applied for the front-line manager position. (Def. SOF ¶ 61). After an interview, he was offered and accepted the position effective October 15, 2004.[5] (Def. SOF ¶ 62).

After Plaintiff became a front-line sales manager, he concluded he had been assigned a low-performing team and complained about the situation to management. (Def. SOF ¶ 64). At the time, there was another front-line manager, Howard Nelms ("Nelms"), a Caucasian. It was determined that Plaintiff and Nelms would be permitted to keep their highest performing sales representatives and were allowed to engage in a "draft" to fill the other spots on their respective teams. (Def. SOF ¶¶ 63-64). Plaintiff claims, however, that this procedure did not produce parity between the

_____

[5]Walker claims that he is the only one who applied for this position. (Pf. Depo. at 24).

10

teams because his team was composed entirely of low performers and hence even his top performers fell short of the number of sales made by most of the representatives on Nelms' team. (Pf. Depo. at 252-255).

Walker remained a front-line sales manager until he resigned from his employment in January 2005. (Def. SOF ¶ 65). On May 17, 2004, Plaintiff filed a charge with the EEOC claiming his removal from the RCI Sales Manager position and his failure to be promoted to RCI Selling Sales Manager position was discriminatory. (Def. SOF ¶ 66). This lawsuit followed.

## II. **APPLICATION OF LAW**

Defendants have moved for summary judgment on all of Plaintiff claims. They have also moved to strike additional facts set forth in Plaintiff's response memorandum.

### A. **Motion to Strike**

In his response brief, Plaintiff sets forth asserted facts in "bullet" form. These facts are not provided in the form contemplated by Local Rule 8(B)(7)(c). That Rule provides that "[a]ny party opposing the motion for summary judgment must respond to each fact set forth by the movant" and that "the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material[.]" With regard to such facts, the Rule goes on to provide that "[e]ach such disputed fact shall be set forth in a separate, numbered paragraph with specific

11

citation to the record supporting the contention that such fact is in dispute."

While it is true, as Plaintiff contends, the Rule states that a non-movant *may* file additional facts but is not required to do so, the Rule goes on to indicate that if such facts are filed they are to be filed in a numbered paragraph format. Even though Plaintiff's additional facts are not in this form, they will not be stricken because the bulleted facts provided by Plaintiff contain appropriate citation to the record.

Defendants also assert that Plaintiff's entire response is untimely because it was filed on February 13, 2006, even though the Magistrate Judge ordered that any response to the Motion for Summary Judgment should be filed by February 10, 2006. Plaintiff acknowledges that deadline was set by way of the Magistrate Judge's Order but claims his filing was timely because "the notice from the Clerk accompanying the motion for summary judgment (RE 24) specified a response date of February 13, 2006." (Docket Entry No. 33 at 3).

While the "notice" which was generated from the Clerk's office in regard to the filing of the Motion for Summary Judgment states "Responses due by 2/13/2006," that date is not "calendered" by the Clerk, as Plaintiff suggests, but instead is generated by the docketing software. In any event, it should be clear beyond doubt that Orders from this Court take precedence over an entry on the

12

docket sheet. Nevertheless, Plaintiff's response will not be stricken because Defendants have alleged no harm and because lawsuits should be determined on the merits to the extent possible.[6]

## B. **Motion for Summary Judgment**

### 1. **Standard of Review**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that

---

[6]Plaintiff has filed a document simply titled "Motion" in which he requests that the Court issue an Order *nunc pro tunc*, that would deem his response to the Motion for Summary Judgment as being filed on February 10, 2006 (Docket Entry No. 34). That Motion will be denied since the Court is considering Plaintiff's response to the Motion for Summary Judgment in formulating this Memorandum and accompanying Order.

13

there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## 2. **Plaintiff's Race Discrimination Claims**

Plaintiff's primary claims of discrimination under Title VII and the THRA[7] have to do with his being removed from the position of RCI Sales Manager and his failure to be promoted when that job was reincarnated as the RCI Selling Sales Manager position. He has no direct evidence of discrimination and hence he may seek to establish discrimination utilizing the paradigm identified in McDonnell Douglas v. Green, 411 U.S. 792 (1973).

To establish a *prima facie* case, Plaintiff must show (1)

---

[7]The same analytical framework is utilized in analyzing claims under Title VII and the THRA. Gee-Thomas v. Cingular Wireless, 324 F.Supp.2d 875, 881 (M.D. Tenn. 2004).

14

membership in a protected class, (2) an adverse employment action, (3) qualification, and (4) dissimilar treatment to one similarly situated. Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992). Upon such a showing, a defendant may rebut the presumption of discrimination[8] by proffering a legitimate, nondiscriminatory reason for its decision, with the plaintiff then bearing the burden of showing that the defendant's proffered reason is pretextual. Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).

In this case, Plaintiff's claims relating to his dismissal as RCI Sales Manager and Defendant's refusal to promote him back into a similar position fail at the *prima facie* stage for two reasons. First, Plaintiff cannot show that he was qualified for the position. Second, he cannot show that others, outside the protected class, were treated differently.

The evidence is undisputed that RCI sales dropped significantly when Plaintiff was at the helm. At the time he took over, the RCI sales department had an APG of 1400. Five months later, that figure had plummeted to barely more that 200. In each of the intervening four months, the RCI sales department APG was markedly below the budgeted APG. Plaintiff's team did not come close to meeting the budgeted APG, and, for four of the five

---

[8]Because it allows for an inference of discrimination even absent direct evidence, the burden-shifting approach described in McDonnell Douglas is not, as Plaintiff states, "a purely technical proposition." (Docket Entry No. 27 at 8).

15

months, did not even meet Plaintiff's own self-imposed APG of 1000. As such, Plaintiff has not presented evidence to "demonstrate that []he was meeting h[is] employer's legitimate expectations and was performing to h[is] employer's satisfaction." Warfield v. Lebanon Correctional Institution, 181 F.3d 723, 729 (6th Cir. 1999).

Additionally, Labelle, the ultimate decision-maker regarding the recreated sales manager position, was the same individual who approved Plaintiff's selection for the RCI Sales Manager position less than eight months earlier. Because Labelle was at the center of both decisions "a strong inference exists that discrimination was not a determining factor for the adverse action." Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 464 (6th Cir. 1995). After all, "[a]n individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class." Id.

Additionally, Plaintiff is not similarly situated to Santore, who assumed the new RCI manager role after Plaintiff's team was disbanded. Not only had Santore been a million-dollar seller, he was not burdened with a history of managing a department with continuing abysmal APG numbers.

Moreover, Plaintiff has pointed to no one who fared as poorly as he did in regard to his or her team's APG figure but remained as

16

a manager.[9] In fact, when Santore's team failed (at least in terms of numbers), the team was disbanded, never to return again.

Even if Plaintiff presented evidence to establish a *prima facie* case, Defendant has articulated a legitimate non-discriminatory reason for its actions in removing Plaintiff from his RCI management position and refusing to promote him back into the reincarnated position - poor performance. Plaintiff has not shown this reason to be pretextual.

A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. <u>Dews</u>, 231 F.3d at 1021. In his brief, Plaintiff does not directly address pretext but instead asserts that, even assuming lack of performance was the reason for Defendants' actions, "the question is WHY did he underperform?" (Docket Entry No. 27 at 10, capitalization in original).

Since Defendants' business is primarily sales and Fairfield has shown that the team under Plaintiff's direction had a consistently low APG figure (and Plaintiff does not argue

---

[9]Plaintiff claims that Ruggerio's team performed "terribly" in the previous off-season but that Ruggerio was not terminated at that time. There is absolutely no evidence to support this claim, other than Plaintiff's unadorned allegation. "Bald assertions are insufficient to create a genuine issue of material fact." <u>Tanqwall v. Jablonski</u>, 111 Fed. Appx. 365, 367 (6th Cir. 2004).

17

otherwise), there is both a factual and sufficient basis for its conduct. This leaves Plaintiff with the option of showing pretext on the ground that the Defendants' conduct did not actually motivate its decision but, instead, was motivated by an improper reason. Plaintiff has presented no such evidence.

In answer to his own question "WHY did he underperform?", Plaintiff posits an additional compound question: "Was it Walker's inability or unwillingness to manage (or sell adequately[)], or was it because Fairfield set him up to fail, going so far as to order that his numbers be falsified?" (Docket Entry No. 27). Presumably, Plaintiff is asserting that the alleged falsification of his numbers is a basis for concluding that Defendants' stated reason for their actions in demoting and then refusing to promote Plaintiff was false.

To support his claim that there was an attempt to falsify his numbers, Plaintiff cites an EEOC charge filed by Hurley. In that charge, Hurley claims he was terminated because he refused Labelle's request that he "create a false performance memo" for Walker so that Santore could be promoted to the RCI Selling Sales Manager position instead of Walker. That alleged request occurred on March 30, 2004.

There is authority for the proposition that an EEOC charge is presumed to be inadmissible in evidence. <u>Stolarczylk v. Senator Intern. Freight Forwarding</u>, 376 F.Supp.2d 834, 841 (N.D. Ill.

18

2005). The rationale for this is that an EEOC charge is hearsay and, even though sworn to under the penalty of perjury, inherently unreliable because the charge is drafted in anticipation of litigation. Id.

Regardless, Hurley's charge does not aid Plaintiff in this case. Hurley claims that, on March 30, 2004, he was asked to draft a falsified memo about Walker's performance. Even if so, this in no way affects the APG figures for October 2003 through February 2004. Those figures, which Plaintiff does not challenge, show that his team consistently had an APG rate which was well below the expected rate. Thus, even if Hurley was asked to draft a performance memo (which he did not do), Plaintiff's poor performance in the role of sales manager was already well-documented.

Plaintiff also appears to be asserting that he was "doomed to fail" because he took over the team during the off-season and his team consisted of poor performers. The problem with that argument is that there is absolutely nothing but conclusory statements to support it. Plaintiff has presented no evidence that in prior years the RCI sales slumped to the level his team performed at during this "off season," or indeed that other sales teams performed well below par during the time that Plaintiff was running the RCI sales team.

As for his suggestion that his team was comprised of poor

19

performers, the record reflects that he inherited the previous team and that two of those individuals subsequently left the team (one was fired and the other took medical leave) and were replaced by new hires. There is not a scintilla of evidence presented that any of this occurred because of Plaintiff's race, or even an inference that had the RCI manager not been African American, these events would not have occurred. See, Maki v. Laakko, 88 F.3d 361, 364 (6th Cir. 1996) ("To preclude summary judgment, the nonmoving party must present evidence, beyond . . . his own conclusory statements, to establish the existence of specific triable facts.")

Apart from his claims relating to RCI sales management, Walker also sets forth other general allegations of disparate treatment. For example, he claims that just before taking over the front-line sales team, the top performers were moved to Nelms' team and that members were reassigned without his input. Leaving aside that in an effort to rectify the situation, Nelms and Walker participated in a draft, Plaintiff has provided no evidence that would raise a question about discrimination playing a role in these events. The only question he raises is one of business judgment, "but such questions are insufficient to overcome summary judgment." Vredevelt v. GEO Group, Inc., 145 Fed. Appx. 122, 133 (6th Cir. 2005).

Plaintiff also claims disparate treatment because he was not allowed to hand out awards to his team at the banquet, because a

20

sales person handed out paychecks to the members of his team on one occasion, and because he did not possess a key to the office he shared as a front-line manager for several months. However, Plaintiff has shown no adverse action with respect to any of these incidents.

Adverse action requires a showing of a material adverse change in the terms and conditions of employment which are more disruptive than a mere inconvenience and constitute such things as "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999)(citation omitted).

Plaintiff admits that with respect to all three incidents he lost no pay, benefits, or responsibilities. He also admits that he was able to use the office whenever he needed.

Perhaps understandably, Plaintiff was upset, even embarrassed, by these events. However, Title VII is not "a general civility code for the American workplace," Burnett v. Tyco Corp., 203 F.3d 980, 982 (6th Cir. 2000), and hence hurt feelings and "bruised egos" are insufficient for liability under Title VII. White v. Burlington Northern & Santa Fe Railway, 364 F.3d 789, 802 (6th Cir. 2004).

21

"The essence of a disparate treatment case is that the employer simply treats some people less favorably than others because of race[.]" <u>Brown v. Brentwood Music, Inc.</u>, 1998 WL 415832 at * 1 (6th Cir. 1998). The Court finds Walker has presented insufficient evidence from which a jury could reasonably conclude that he was discriminated against on account of his race.

### 3. <u>Retaliation and Constructive Discharge Claims</u>

Plaintiff alleges he was constructively discharged as a result of racial discrimination and retaliation. (Docket Entry No. 1 ¶ 9). It appears to be his contention that because of the overall situation at Fairfield after he filed his EEOC charge on May 17, 2004, he was compelled to resign.

In order to establish a *prima facie* case of retaliation under Title VII, Plaintiff must show: "(1) []he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action." <u>Morris v. Oldham County Fiscal Court</u>, 201 F.3d 784, 791 (6th Cir. 2000) (emphasis omitted).

Unquestionably, the filing of an EEOC charge is an activity protected by Title VII and Defendant knew of the filing of such a

22

charge in this case. Where Plaintiff's claim falters, however, is in regard to the third element - that an adverse action was taken by the employer. Presumably, the adverse action was Plaintiff's resigning from his employment, something which he claims he was compelled to do because conditions were so bad he was constructively discharged.

The Sixth Circuit in <u>Trepka v. Board of Educ. Of Cleveland</u>, 28 Fed.Appx. 455, 460 (6th Cir. 2002)(unpublished) summarized the analysis to be undertaken in cases alleging constructive discharge:

> [Plaintiff's] incantation of the words 'constructive discharge,' of course, is not sufficient to establish a cause of action because, absent explicit contractual provisions to the contrary, an employer may explicitly discharge any employee at will[.] Rather, conduct that forces an employee to quit, constituting "constructive discharge," is actionable only if the conduct is motivated by discriminatory intent against a protected employee characteristic. The discriminatory conduct must then make working conditions 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'...
> Indeed, simple proof of discrimination is not enough to convert an employee's resignation into an actionable constructive discharge. Instead, there must be, in addition, aggravating factors, constituting at least a continuous and severe pattern of discriminatory treatment.

<u>Id.</u>, at 462-63 (internal citations and parenthetical omitted).

This Court has already reviewed Plaintiff's allegations of improper treatment. Viewing the facts in the light most favorable to him, this Court is unable to conclude a jury could find the evidence in this case paints a picture of discrimination or intolerable working conditions such that a reasonable person would

have felt compelled to resign.  See, <u>Johnston v. O'Neill</u>, 130 Fed.

Appx. 1, 7 (6th Cir. 2005)(holding summary judgment proper on

constructive discharge claim where Plaintiff "cannot show both that

his employer deliberately created intolerable working conditions

with the intention of forcing him to quit, and that a reasonable

person working under those conditions would have felt compelled to

quit").[10]  Stated differently, the Court finds Plaintiff has simply

not shown that his "working environment became so intolerable that

h[is] resignation qualified as a fitting response."  <u>Pennsylvania</u>

<u>State Police v. Suders</u>, 542 U.S. 129, 124 S.Ct. 2342, 2347, 159

L.Ed.2d 204 (2004).

### III.    CONCLUSION

On the basis of the foregoing, Defendants' Motion to Strike

(Docket Entry No. 30) will be denied.  Plaintiff's Motion for a

*nunc pro tunc* Order will be denied as moot.  Defendants' Motion for

Summary Judgment (Docket Entry No. 24) will be granted and this

case will be dismissed.

An appropriate Order will be entered.

---

[10]In his brief, Plaintiff asserts that "since intent is paramount, constructive discharge is by definition a jury issue." (Docket Entry No. 27 at 6-7).  If this is the law, then the Sixth Circuit erred in affirming summary judgment in <u>O'Neill</u>, as well as in numerous other cases alleging constructive discharge.  <u>See</u>, e.g., <u>Gujral v. Allstate Ins. Co.</u>, 68 Fed. Appx. 704 (6th Cir. 2003); <u>Lindsay v. Pizza Hut</u>, 57 Fed. Appx. 648 (6th Cir. 2003); <u>Peters v. Lincoln Elec. Co.</u>, 285 F.3d 456 (6th Cir. 2002).

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

25